**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT DOCKET**

|  |  |  |
|---|---|---|
| PROTECT MY CHECK, INC., | ) | |
| | ) | |
| Plaintiff, | ) | **MEMORANDUM IN SUPPORT OF** |
| | ) | **PLAINTIFF'S MOTION FOR** |
| v. | ) | **PRELIMINARY INJUNCTION** |
| | ) | |
| CRAIG C. DILGER, Chairman, Kentucky | ) | |
| Registry of Election Finance, in his official | ) | Civil Action No.   3:15-CV-42-GFVT |
| capacity; JOHN STEFFEN, Executive | ) | |
| Director, Kentucky Registry of Election | ) | |
| Finance, in his official capacity, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## TABLE OF CONTENTS

SUMMARY ................................................................................................................... 1

ARGUMENT ................................................................................................................ 4

    I.    **PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS.** ................................ 4

       A.  *The Contribution Ban Burdens Protected Speech.* ........................................... 5

       B.  *The Contribution Ban Violates the Fourteenth Amendment.* .......................... 5

       C.  *The Contribution Ban Violates the First Amendment.* ................................... 12

    II.   **PLAINTIFF IS SUFFERING IRREPARABLE HARM.** ....................................... 15

    III.  **AN INJUNCTION WOULD NOT CAUSE SUBSTANTIAL HARM TO OTHERS.** ............................................................................................... 16

    IV.  **GRANTING AN INJUNCTION IS IN THE PUBLIC INTEREST, GIVEN THE IMPORTANT CONSTITUTIONAL RIGHTS AT STAKE.** ........... 16

    V.   **THE WAIVER OF BOND IS APPROPRIATE.** ..................................................... 17

CONCLUSION ........................................................................................................... 18

ii

# TABLE OF AUTHORITIES

## Cases

*Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990) ............................ 10, 13, 14, 16

*Baca v. Moreno Valley Unified School Dist.*, 936 F. Supp. 719 (C.D. Cal. 1996) ...................... 21

*Barahona-Gomez v. Reno*, 167 F.3d 1228 (9th Cir. 1999) ............................................................ 20

*Bruner v. Zawacki*, 2013 WL 2903241 (E.D. Ky. 2013) ................................................................ 7

*Buckley v. Valeo*, 424 U.S. 1 (1976) ...................................................................................... passim

*Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*,
511 F.3d 535 (6th Cir. 2007) ..................................................................................................... 7

*Chicago Teachers Union v. Hudson*, 475 U.S. 292 (1986) ........................................................ 14

*Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010) ............................................. passim

*City of Ladue v. Gilleo*, 512 U.S. 43 (1994) ...................................................................... 10, 17

*Connection Distrib. Co. v. Reno*, 154 F.3d 281 (6th Cir. 1998) ............................................. 7, 19

*Dallman v. Ritter*, 225 P.3d 610 (Colo. 2010) .................................................................. 11, 12

*Davis v. Fed. Election Comm'n*, 554 U.S. 724 (2008) ................................................................ 14

*Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*,
274 F.3d 377 (6th Cir. 2001) ................................................................................................ 7, 19

*Doe v. Pittsylvania County, Va.*, 842 F. Supp. 2d 927 (W.D. Va. 2012) ..................................... 21

*Elrod v. Burns*, 427 U.S. 347 (1976) ................................................................................. 7, 19

*Eu v. San Francisco County Democratic Central Comm.*, 489 U.S. 214 (1989) ........................ 5

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ............................................................ 20

*Fed. Election Com'n v. Nat'l Conservative Political Action Committee*,
470 U.S. 480 (1985) .................................................................................................................. 9

*Fed. Election Comm'n v. Beaumont*, 539 U.S. 146 (2003) ......................................... 16, 17, 18

*First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765 (1978) ....................................................... 8

*Hamilton's Bogarts, Inc. v. Michigan*, 501 F.3d 644 (6th Cir. 2007) ....................................... 19

*Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219 (6th Cir. 2011) ................................. 7

*Iowa Right To Life Comm., Inc. v. Tooker*,
717 F.3d 576 (8th Cir. 2013) .................................................................................................. 13

*Kentucky Right to Life, Inc. v. Terry*, 108 F.3d 637 (6th Cir. 1997) .......................................... 17

*Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Michigan Gaming Control Bd.*,
172 F.3d 397 (6th Cir. 1999) .................................................................................................... 9

*McCutcheon v. Fed. Election Com'n*, 134 S. Ct. 1434 (2014) ............................................. passim

*Miller v. City of Cincinnati*, 622 F.3d 524 (6th Cir. 2010) .................................................. 8, 20

*Minnesota Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864 (8th Cir. 2012) ............ 18

*Newsom v. Norris*, 888 F.2d 371 (6th Cir. 1989) ................................................................ 7, 19

*Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377 (2000) ....................................................... 10

*People of State of Cal ex rel. Van de Kamp v. Tahoe Regional Planning Agency*,
766 F.2d 1319 (9th Cir.) ......................................................................................................... 21

*Police Dep't of Chicago v. Mosley*, 408 U.S. 92 (1972) ............................................................ 9

*Riddle v. Hickenlooper*, 742 F.3d 922 (10th Cir. 2014) ............................................................ 10

*Sak v. City of Aurelia, Iowa*, 832 F. Supp. 2d 1026 (N.D. Iowa 2011) ..................................... 21

*Santa Clara County v. Southern Pac. R. Co.*, 118 U.S. 394 (1886) ............................................ 9

*Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1 (1st Cir. 2012) .................. 13

*Smith v. Board of Election Com'rs for City of Chicago*, 591 F. Supp. 70 (N.D. Ill. 1984)......... 21

*Stockslager v. Carroll Elec. Cooperative Corp.*, 528 F.2d 949 (8th Cir. 1976).......................... 20

*United Automobile, Aerospace and Agricultural Implement Workers of America Local 3047, et al., v. Hardin County, KY, et al.*, Case No. 3:15-cv-00066 (W.D. Ky., filed Jan. 14, 2015).... 11

*United States v. Hagerman*, 545 F.3d 579 (7th Cir. 2008) ......................................................... 12

*United States v. Playboy Entertainment Group, Inc,* 529 U.S. 803 (2000) ................................. 10

*Wagner v. Fed. Election Com'n*, No. 13-5162, 2015 WL 4079575 (D.C. Cir. July 7, 2015) ...... 10

*Woodhouse v. Maine Com'n on Governmental Ethics & Election Practices*,
40 F. Supp. 3d 186 (D. Me. 2014) ........................................................................................ 10

## Statutes

2 U.S.C. § 441b(b)(2)(C) ..................................................................................................... 16

32 Ky. Admin. Regs. 2:170 .............................................................................................. 5, 22

Fed. R. Civ. P. 65(c) ............................................................................................................ 20

KRS 121.025.......................................................................................................... 5, 12, 17, 22

KRS 121.035.................................................................................................................. 5, 17, 22

KRS 121.150............................................................................................................. 5, 6, 17, 22

KRS 121.990........................................................................................................................... 5

## Other Authorities

*State Limits on Contributions to Candidates*, National Conference of States Legislatures
(Oct. 2013), http://www.ncsl.org/research/elections-and-campaigns/state-limits-on-contributions-to-candidates.aspx. ...................................................................................... 15

## Treatises

11A Charles Alan Wright, Arthur R. Miller, et al.,
Federal Practice and Procedure § 2948.3 (2014) ..................................................................... 8

## Constitutional Provisions

Ky. Const. § 150 ................................................................................................................ 5, 22

## <u>SUMMARY</u>

Plaintiff seeks this injunction to halt a brazen discrimination in Kentucky law:  banning corporations from making political contributions, while allowing unions and limited liability companies to contribute up to $1,000 for each election to a candidate or political committee and up to $2,500 each year to a political party.  Forty-two states and the federal government apply the same contribution limits to unions and corporations; the Constitution requires that Kentucky do so as well.

Constitutional protections for freedom of speech have their "'fullest and most urgent application' to speech uttered during a campaign for political office."  *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339 (2010) (quoting *Eu v. San Francisco County Democratic Central Comm.*, 489 U.S. 214, 223 (1989)).  Accordingly, political "contribution and expenditure limitations operate in an area of the most fundamental First Amendment activities."  *Buckley v. Valeo*, 424 U.S. 1, 14 (1976).

Kentucky campaign finance law is of two minds when it comes to political contributions to benefit candidates. On the one hand, corporations are banned from making candidate contributions, both directly from a corporation's general treasury and indirectly through a corporation-financed PAC.  *See* Advisory Opinion 2008-003 (Compl. Ex. 1).  Corporations may not even establish, finance, maintain, and control a PAC that contributes to candidates.  *See* Advisory Opinion 2014-003 (Compl. Ex. 2); Ky. Op. Atty. Gen. 91-80 (Compl. Ex. 3).  The corporate contribution ban originates in Section 150 of the Kentucky Constitution, and is enforced through various statutes and regulations.  *See* KRS 121.025, 121.035, and 121.150(20); 32 Ky. Admin. Regs. 2:170 (hereinafter collectively referred to as "Section 150").

1

The penalties for violating the ban can be severe.  An offending corporation forfeits all right to carry on any business in Kentucky and can be fined up to $10,000; any officer, director, or agent of a contributing corporation is guilty of a Class D felony and can also be fined up to $10,000.  Ky. Const. § 150; KRS 121.990.  On its face and as applied by Defendants through the various statutes, regulations, and Advisory Opinions cited herein, Section 150 imposes an outright ban on candidate contributions by corporations, both directly from their general treasuries and indirectly from corporate PACs.

On the other hand, unincorporated groups—including unions and LLCs—are free to make candidate contributions, both directly and through union- or LLC-controlled PACs.  *See* Advisory Opinion 2002-006 (Compl. Ex. 4) ("[P]rovided the Teamsters Local Union No. 783 is not incorporated . . . you may accept the contribution on behalf of Mr. Engel's campaign."); Advisory Opinion 2003-006 (Compl. Ex. 5) ("[T]he conduct you propose under the LLC form would not fall within the Kentucky campaign finance provisions prohibiting corporate contributions.").  Unions, LLCs, or their affiliated PACs may contribute up to $1,000 to each candidate, campaign committee, and political issues committee in any one election.  KRS 121.150(6).  They can also contribute up to $2,500 to a political party and its subdivisions and affiliates or to a caucus campaign committee in any one year.  KRS 121.150(11).  In other words, corporations are totally prohibited from contributing to political candidates, parties, or committees, but unincorporated groups may freely contribute up to ordinary limits.

There is no legitimate justification for allowing unions and LLCs to contribute thousands of dollars to candidates, parties, and political committees, while completely banning contributions from corporations.  This disparity violates the equal protection, free speech, and free association protections of the United States Constitution.

2

Plaintiff Protect My Check, Inc. is a Florida non-profit corporation, authorized to do business in Kentucky.  Declaration of Brent Yessin ¶¶ 5, 6 (attached as Exhibit 1).  Protect My Check supports local legislators, workers, and employers who seek to expand employee rights and create jobs by passing local right to work protections in the 25 states, including Kentucky, that lack statewide protections.  *Id.* ¶ 7.  Unions, for their part, work tirelessly to oppose Protect My Check's efforts.  *Id.* ¶ 8.  But only unions can support political candidates, parties, and committees under Section 150, creating an unconstitutionally lopsided playing field.  Plaintiff filed the instant action seeking declaratory and injunctive relief to remedy Defendants' unconstitutional deprivation of its right to engage in political speech.  But for Defendants' enforcement of the Section 150 ban, Protect My Check would contribute to candidates, parties, and political committees in order to support candidates who share its goal of empowering individual workers.  *Id.* ¶¶ 9–11.

Issuance of a preliminary injunction to abate the Section 150 contribution ban is appropriate here because:  (1) Plaintiff is likely to succeed on the merits; (2) Plaintiff is likely to suffer irreparable harm in the absence of preliminary relief; (3) providing Plaintiff with injunctive relief will not harm others; and (4) an injunction is in the public interest.  *Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 233 (6th Cir. 2011) (*citing Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.,* 511 F.3d 535, 542 (6th Cir. 2007)).  These factors are not "prerequisites that must be met.  Instead, they are interconnected factors that the Court must balance to determine if a preliminary injunction should be granted."  *Bruner v. Zawacki*, 2013 WL 2903241, *2 (E.D. Ky. 2013).

The ongoing deprivation of Plaintiff's constitutional rights constitutes irreparable harm.  *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) ("[I]t is well-settled that loss

3

of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.") (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality) (internal quotations omitted))*.*  Because Plaintiff raises a substantial constitutional claim, no further showing of irreparable injury is necessary.  *Newsom v. Norris,* 888 F.2d 371, 378 (6th Cir. 1989) (citing *Elrod* ) ("The Supreme Court has unequivocally admonished that even minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief.").  An injunction will not harm others because no substantial harm to others can occur from enjoining enforcement of an unconstitutional law.  *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377, 400 (6th Cir. 2001) ("[I]f the plaintiff shows a substantial likelihood that the challenged law is unconstitutional, no substantial harm to others can be said to inhere in its enjoinment.").  Likewise, it is obvious that the public interest is served by requiring adherence to the Constitution, which is all that Plaintiff requests here.  *Miller v. City of Cincinnati*, 622 F.3d 524, 540 (6th Cir. 2010).  For these reasons, as further demonstrated below, Plaintiff is entitled to a preliminary injunction.

## ARGUMENT

### I.   PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS.

Plaintiff need not demonstrate it is certain to win; a substantial likelihood of success on the merits warrants issuing the injunction.  *See, e.g., Miller*, 622 F.3d at 528; *see also* 11A Charles Alan Wright, Arthur R. Miller, et al., Federal Practice and Procedure § 2948.3 (2014) ("The courts use a bewildering variety of formulations of the need for showing some likelihood of success . . . [but] [a]ll courts agree that plaintiff must present a prima facie case but need not show a certainty of winning.").  Because the Section 150 contribution ban is inconsistent with the Supreme Court decisions discussed below, this burden is met.

A.    *The Contribution Ban Burdens Protected Speech.*

The political speech of corporations—including political contributions and expenditures—is protected by the First and Fourteenth Amendments to the United States Constitution.  *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 777 (1978); *Citizens United*, 558 U.S. at 365.  The right to make political contributions is protected by the First Amendment's guarantees of freedom of political expression and association.  *McCutcheon v. Fed. Election Com'n*, 134 S. Ct. 1434, 1448 (2014).  A political contribution "serves as a general expression of support for the candidate and his views" and "serves to affiliate a person with a candidate." *Id.* (quoting *Buckley*, 424 U.S. at 21–22.).  The only government interest compelling enough to justify regulation of these fundamental rights is preventing quid pro quo corruption or the appearance thereof.  *Fed. Election Com'n v. Nat'l Conservative Political Action Committee*, 470 U.S. 480, 496–497 (1985) (*NCPAC*).  As discussed below, the contribution ban fails to serve the corruption prevention interest; even if the ban could serve that interest, it goes too far in restricting fundamental freedoms, ignoring both the equal protection clause of the Fourteenth Amendment, as well as the free speech and association clauses of the First Amendment.

B.    *The Contribution Ban Violates the Fourteenth Amendment.*

Plaintiff first seeks relief from the Section 150 contribution ban because it denies equal protection of the law guaranteed by the Fourteenth Amendment to the United States Constitution.  Compl. ¶¶ 33–41.  Corporations, no less than individuals, are entitled to equal protection.  *Santa Clara County v. Southern Pac. R. Co.*, 118 U.S. 394, 396 (1886).  Because the Section 150 contribution ban implicates the constitutionally protected fundamental right of free speech, it is subject to strict scrutiny under the Equal Protection Clause.  *See Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 101 (1972) ("The Equal Protection Clause requires that statutes affecting

5

First Amendment interests be narrowly tailored to their legitimate objectives."); *Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Michigan Gaming Control Bd.*, 172 F.3d 397, 410 (6th Cir. 1999) (same and collecting cases).  This means that "statutory classifications impinging upon [political expression] must be narrowly tailored to serve a compelling governmental interest."  *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652, 666 (1990), *overruled on other grounds by Citizens United*, 558 U.S. at 365.[1]

Applying strict scrutiny here, the contribution ban fails.  The burden is on Defendants to justify a ban on corporations' political contributions, while allowing both unions and LLCs to make thousands of dollars in contributions.  *See United States v. Playboy Entertainment Group, Inc.,* 529 U.S. 803, 816 (2000) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions.");  *City of Ladue v. Gilleo*, 512 U.S. 43, 52 (1994) (Regulatory exemptions "may diminish the credibility of the government's rationale for restricting speech in the first place.").  This is a heavy burden, which requires Defendants to offer evidence of a causal link between the ban and preventing corruption.  *Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377, 379 (2000) ("This Court has never accepted mere conjecture as adequate to carry a First Amendment burden . . . .").  Defendants will not be able to meet this

---

[1] Some courts have applied the lesser "closely drawn" test to equal protection claims involving political contributions, rather than the "narrowly tailored" test required by strict scrutiny.  *Riddle v. Hickenlooper*, 742 F.3d 922, 927 (10th Cir. 2014) (striking down contribution limits under "closely drawn" test, but noting that "by treating the contributors differently, the statute impinged on the right to political expression . . . .  As a result, we conclude that the statutory classification impinged on a fundamental right. . . .  This conclusion would ordinarily require us to apply strict scrutiny."); *Wagner v. Fed. Election Com'n*, No. 13-5162, 2015 WL 4079575, *26 (D.C. Cir. July 7, 2015) (declining to apply strict scrutiny); *Woodhouse v. Maine Com'n on Governmental Ethics & Election Practices*, 40 F. Supp. 3d 186, 195 (D. Me. 2014) (striking down contribution limits under "closely drawn" test).  Regardless how the test is described, "if a law that restricts political speech does not 'avoid unnecessary abridgement' of First Amendment rights, it cannot survive 'rigorous' review."  *McCutcheon*, 134 S. Ct. at 1445–46 (quoting *Buckley*, 424 U.S. at 25).

burden.  Defendants must offer evidence that justifies the rationale that unions and LLCs can contribute thousands of dollars to candidates with no threat of corruption, but a single dollar from a corporation would destroy public confidence in democracy.  On its face, that is impossible because Kentucky's "selection of a [$1,000 contribution] limit indicates its belief that contributions of that amount or less do not create a cognizable risk of corruption." *McCutcheon*, 134 S. Ct. at 1452.

There is no justification for treating corporations differently from unions.  Although corporations and unions are structured differently, these structural differences are irrelevant to the equal protection inquiry here.  The critical inquiry in equal protection cases is whether the disparate treatment of two groups can be justified on the basis of differences relevant in the context.  *See Dallman v. Ritter*, 225 P.3d 610, 634–35 (Colo. 2010).  The Colorado Supreme Court struck down a similar discriminatory law on equal protection grounds in *Dallman* because, "[a]lthough unions and corporations are structurally dissimilar, both are similarly situated under Amendment 54's [ban on candidate contributions]." *Id*.  That case was similar to this one except union PACs were prohibited from contributing to candidates, but corporate PACs were allowed to donate.  *Id*. at 634 n.41.

In *Dallman*, the Colorado Supreme Court realized that, when they meet on the political battlefield, corporations and unions are functionally equivalent.  *Id*. at 634–35.  Indeed, they are often opposed forces, serving as point and counter-point on many issues.  Plaintiff's mission to expand employee rights and create jobs by supporting local right to work protections has been

aggressively opposed by unions in Kentucky.[2] But while Plaintiff is forbidden from supporting political candidates that favor right to work, its union opponents are free to fund their political allies. Plaintiff, like all corporations in Kentucky, faces a total prohibition on its political contributions to candidates, parties, and PACs.

Moreover, the arbitrary and discriminatory nature of the corporate ban in the present case is even more evident than the ban struck down in *Dallman* because the Section 150 contribution ban also permits LLCs to make political contributions to candidates, parties, and PACs. Unlike unions, LLCs *are* structurally similar to corporations. *See United States v. Hagerman*, 545 F.3d 579, 581 (7th Cir. 2008) ("[A]n LLC is a cross between a corporation and a partnership."). Section 150's disparate treatment of corporations and LLCs is offensive to the Fourteenth Amendment guarantee of equal protection because there are no relevant differences between the two type of companies—in the context of the contribution ban or any other. *Dallman*, 225 P.3d at 634–635.

If the lopsided direct contribution limits were not enough, the Section 150 ban also prohibits corporations from using any resources to establish, finance, maintain, or control PACs that contribute to candidates, parties, or other PACs. *See* Advisory Opinion 2014-003 (Compl. Ex. 2); Ky. Op. Atty. Gen. 91-80 (Compl. Ex. 3); *cf. Dallman*, 225 P.3d at 634 n.41 ("[T]he fact that a corporation can advocate its views through a PAC under Amendment 54 while a union cannot represents disparate treatment under the Fourteenth Amendment."). Meanwhile, PACs controlled by unions and LLCs can contribute up to the ordinary PAC limits. *See* Advisory

---

[2] For example, Plaintiff supported Hardin County's effort to pass a local right to work law. In response, nine unions filed a lawsuit challenging the law. *See United Automobile, Aerospace and Agricultural Implement Workers of America Local 3047, et al., v. Hardin County, KY, et al.*, Case No. 3:15-cv-00066 (W.D. Ky., filed Jan. 14, 2015).

Opinion 2003-006 (Compl. Ex. 5). Corporations may not freely allocate any resources to such a PAC. KRS 121.035(1); *see also* Advisory Opinion 2008-003 (Compl., Ex. 1); Advisory Opinion 2014-003; Ky. Op. Atty. Gen. 91-80. Defendants' restrictive treatment of corporations and permissive treatment of unions and LLCs tips the political landscape against the former and in favor of the latter. There is no legitimate justification for such unjust treatment.

That the Section 150 ban prohibits even corporate PAC contributions distinguishes it from corporate speech restrictions that have been upheld by other courts. *See Austin*, 494 U.S. at 660 ("Contrary to the dissents' critical assumptions . . . the Act does not impose an *absolute* ban on all forms of corporate political spending but permits corporations to make independent political expenditures through separate segregated funds."); *Iowa Right To Life Comm., Inc. v. Tooker*, 717 F.3d 576, 602 (8th Cir. 2013) *cert. denied*, 134 S. Ct. 1787 (2014) ("The ban is also not complete—entities may contribute through PACs."). Those older decisions go against the grain of recent U.S. Supreme Court decisions; but even under their reasoning, total contribution bans simply go too far. The Section 150 ban is a particularly harsh curtailment of corporations' political speech, set against permissive allowances for union and LLC political speech. No court has upheld the sort of lopsided political contribution ban enforced by Defendants.

Moreover, the courts' reasons for upholding corporate speech restrictions in those older cases have been eroded by the subsequent evolution of campaign finance case law. Courts have suggested two differences between unions and businesses in applying equal protection guarantees to political speech restrictions, but both these differences have been disavowed in subsequent decisions: (1) protecting shareholders from ultra vires activities; and (2) "antidistortion," i.e., leveling the political playing field by restricting the influence of political war chests amassed with the state-conferred advantages of the corporate form.

9

The Supreme Court has rejected shareholder protection as a legitimate reason for restricting political speech.  Concerns over protecting dissenting shareholders from being compelled to fund corporate political speech cannot justify bans on corporate speech; "the remedy is not to restrict speech but to consider and explore other regulatory mechanisms.  The regulatory mechanism here, based on speech, contravenes the First Amendment."  *Citizens United*, 558 U.S. at 362; *see also Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 13 (1st Cir. 2012) (same).  This is a sound conclusion because, like union members, shareholders have procedures in place to protect their interests.  *See, e.g., Austin*, 494 U.S. at 686 (Scalia, J., dissenting) (shareholders); *Chicago Teachers Union v. Hudson*, 475 U.S. 292, 307 (1986) (unions).  Diminishing fundamental freedoms to protect shareholders from the specter of political spending was never necessary and the Supreme Court has now made that clear.[3]  *Citizens United*, 558 U.S. at 362.

Nor has the Supreme Court long tolerated speech restrictions that embrace the so-called antidistortion rationale, i.e., preventing "the corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the corporate form and that have little or no correlation to the public's support for the corporation's political ideas."  *Austin*, 494 U.S. at 660.  The Court relied on this so-called antidistortion interest in *Austin* to rationalize different limits on speech for unions and businesses, in order to "eliminat[e] from the political process the corrosive effect of political 'war chests' amassed with the aid of the legal advantages

---

[3] Even if shareholder protection were relevant, Section 150 would be overbroad to accomplish this purpose.  First, because it bans political speech by corporations that do not have multiple shareholders as well as those that do.  *See Citizens United*, 558 U.S. at 362 ("[T]he statute is overinclusive because it covers all corporations, including . . . for-profit corporations with only single shareholders.").  Second, as discussed *infra*, because it overlooks less burdensome alternatives to protect shareholder rights.  *See id.; McCutcheon*, 134 S. Ct. at 1459–60.

given to corporations." *Id*. at 666. But the Court has subsequently thrice repudiated the idea that the government's desire to level the political playing field justifies any limits on speech. *Davis v. Fed. Election Comm'n,* held that leveling the playing field is not a constitutionally cognizable interest. 554 U.S. 724, 742 (2008) ("[I]t is a dangerous business for Congress to use the election laws to influence the voters' choices."). *Citizens United* reinforced the holding that the antidistortion interest is invalid and held that the mere fact that a group has taken on the corporate form (with its associated state-conferred advantages) is not a legitimate reason to infringe speech. 558 U.S. at 349 ("If the antidistortion rationale were to be accepted, however, it would permit Government to ban political speech simply because the speaker is an association that has taken on the corporate form."). *McCutcheon v. Fed. Election Comm'n* put another nail in the antidistortion rationale's coffin, striking down the $48,600 federal aggregate limit on candidate contributions, reasoning "[i]t is no answer to say that the individual can simply contribute less money to more people. . . . [A]s we have recently admonished, the Government may not penalize an individual for 'robustly exercis[ing]' his First Amendment rights." 134 S.Ct. 1434, 1449 (2014) (citing *Davis*, 554 U.S. at 739). The Supreme Court's repeated rejection of the antidistortion rationale makes it immaterial to Plaintiff's claims.

The decisions examined above show that there is simply no reason to treat corporations differently from unions and LLCs in the political speech context. Whatever valid campaign finance limits apply to unions and LLCs should apply to corporations, and vice versa. Indeed, this is the approach taken by 42 states and the federal government. *State Limits on Contributions to Candidates*, National Conference of States Legislatures (Oct. 2013), http://www.ncsl.org/research/elections-and-campaigns/state-limits-on-contributions-to-candidates.aspx. More important, it is the approach required by the Equal Protection Clause of

11

United States Constitution.  Therefore, the Section 150 contribution ban should be enjoined to the extent that it prohibits Plaintiff from contributing to political candidates, PACs, or party committees on the same terms as unions and LLCs.

        *C.*      *The Contribution Ban Violates the First Amendment*.

Plaintiff also seeks relief from the contribution ban because it violates its freedom of speech and association.  Compl. ¶¶ 42–48.  Even if Section 150 treated the political speech of corporations, LLCs, and unions equally and therefore did not violate the equal protection guarantee, it would still violate the right of free speech and the closely related right of free association.

In the First Amendment context, the Supreme Court has held that limitations on political contributions must be "closely drawn," but not "narrowly tailored."  *McCutcheon*, 134 S. Ct. at 1445–46.  Here, this is a distinction without a difference because Section 150 is neither "closely drawn" nor "narrowly tailored."  Regardless how the test is described, "if a law that restricts political speech does not 'avoid unnecessary abridgement' of First Amendment rights, it cannot survive 'rigorous' review."  *McCutcheon*, 134 S. Ct. at 1445–46 (quoting *Buckley*, 424 U.S. at 25).  The contribution ban's total prohibition on corporations' political contributions unnecessarily abridges the freedoms protected by the First Amendment.

The Supreme Court has upheld certain limits on corporate political contributions.  *Fed. Election Comm'n v. Beaumont*, 539 U.S. 146, 149 (2003); *Austin*, 494 U.S. at 660; *Buckley v. Valeo*, 424 U.S. 1, 29 n.31 (1976).  Those older decisions have been largely repudiated by recent Supreme Court decisions, as explored below; yet, even those cases' more deferential First Amendment test for corporate contribution limits is offended by Section 150's outright ban.  The Supreme Court has never upheld a regulation on *direct* corporate political contributions without

12

noting that it was doing so because those regulations allowed corporations to make *indirect* contributions through establishing, financing, maintaining, and controlling a PAC. *Beaumont*, 539 U.S. at 149 ("The prohibition does not, however, forbid 'the establishment, administration, and solicitation of contributions to a separate segregated fund to be utilized for political purposes.'" (quoting 2 U.S.C. § 441b(b)(2)(C))); *see Austin*, 494 U.S. at 660 ("We find that the Act is precisely targeted to eliminate the distortion caused by corporate spending while also allowing corporations to express their political views [through PACs]."); *Buckley*, 424 U.S. at 29 n.31 ("Corporate and union resources without limitation may be employed to administer these [PAC] funds and to solicit contributions from employees, stockholders, and union members."). Under Section 150, a corporation can give no support to a PAC. Advisory Opinion 2008-003. It is enough here to recognize that the lack of a "PAC option" is fatal to Section 150. *Beaumont*, 539 U.S. at 163 ("The PAC option allows corporate political participation without the temptation to use corporate funds for political influence . . . ."); *see also Kentucky Right to Life, Inc. v. Terry*, 108 F.3d 637, 645 (6th Cir. 1997) (noting that although federal law prohibits direct contributions by corporations to candidates "the statute permitted corporations to make limited campaign contributions from separate segregated funds solicited explicitly for that purpose.").[4]

---

[4] While the Sixth Circuit upheld KRS 121.025's ban on direct corporate contributions against a First Amendment challenge in *Kentucky Right to Life,* that decision is inapplicable here. In *Kentucky Right to Life*, the plaintiffs argued that only the *direct* contribution ban was unconstitutional, only as applied to *nonprofit* corporations. *Id.* at 645–46. The Sixth Circuit rejected that argument because there is no meaningful distinction between nonprofit and for-profit corporations in the context of the contribution ban, just as there is no meaningful distinction between corporations, LLCs, and unions in the context of the ban. Plaintiff's claim here was never raised in *Kentucky Right to Life*: whether the Section 150 ban on both direct and indirect corporate contributions can be justified on the basis of reducing corruption when all other similarly situated groups can make contributions without any apparent threat of corruption. Given the selective reach of the contribution ban, Defendants cannot justify a total ban on corporate contributions alone. *City of Ladue*, 512 U.S. at 52.

For purposes of enjoining the contribution ban, it is sufficient to acknowledge that Section 150 provides no accommodation for political speech through corporate PACs. *Beaumont*, 539 U.S. at 163.  It is far from certain that the Supreme Court would find the PAC option to be a sufficient alternative since a PAC "does not allow corporations to speak." *Citizens United*, 558 U.S. at 337.  For now, whether the PAC option goes far enough is academic in light of Section 150's unequivocal ban.  At the very least, the contribution ban must be enjoined because it lacks a "PAC option [that] allows corporate political participation." *Beaumont*, 539 U.S. at 163.

If Section 150 applied a more nuanced restraint on only *direct* corporate contributions— as the Court's decision in *Beaumont* allowed—it would still violate the First Amendment.  The Supreme Court has significantly undermined the core holding of *Beaumont*, "leaving its precedential value on shaky ground." *Minnesota Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 879 n.12 (8th Cir. 2012).  *Beaumont*'s First Amendment analysis relies heavily on the shareholder protection and antidistortion rationales, which—as explained above in the context of *Austin*'s Equal Protection analysis—have been repudiated since *Beaumont* was decided.  *Beaumont* also justified regulation of direct corporate contributions on the concern that corporations could be "misuse[d] as conduits for circumventing the contribution limits imposed on individuals . . . ." 539 U.S. at 160.  But the Court has since held that disclosure is the proper approach to circumvention, rather than aggregate contribution limits (let alone contribution bans):

> Disclosure requirements burden speech, but—unlike the aggregate limits—they do not impose a ceiling on speech.  For that reason, disclosure often represents a less restrictive alternative to flat bans on certain types or quantities of speech.  With modern technology, disclosure now offers a particularly effective means of arming the voting public with information.

*McCutcheon*, 134 S. Ct. at 1459–60 (citations omitted).  Every aspect of *Beaumont*'s First

Amendment analysis—shareholder protection, antidistortion, and anticircumvention—has been

bankrupted by subsequent refinement of the Supreme Court's campaign finance jurisprudence.

*Beaumont* leads to the conclusion that Section 150 is unconstitutional because it has no PAC

option; but even if there were a PAC option and *Beaumont* thus pointed the other way, it would

be a thin reed to support a ban on direct political contributions from corporations.  Therefore, the

Section 150 contribution ban should be enjoined to the extent that it prohibits Plaintiff from

contributing to political candidates, PACs, or party committees.

## II.     PLAINTIFF IS SUFFERING IRREPARABLE HARM.

Because Plaintiff has a strong possibility of success on the merits, an injunction would be

appropriate even without a strong showing on the equitable factors; however, those factors also

weigh strongly in Plaintiff's favor.  *Connection Distrib. Co.*, 154 F.3d at 288 ("When a party

seeks a preliminary injunction on the basis of the potential violation of the First Amendment, the

likelihood of success on the merits often will be the determinative factor.").

The ongoing deprivation of Plaintiff's constitutional rights constitutes irreparable harm.

*Newsom,* 888 F.2d at 378 ("The Supreme Court has unequivocally admonished that even

minimal infringement upon First Amendment values constitutes irreparable injury sufficient to

justify injunctive relief.") (citing *Elrod* ).  Because Plaintiff raises a substantial constitutional

claim, no further showing of irreparable harm is necessary.  *Id.*; *see also Hamilton's Bogarts, Inc.*

*v. Michigan*, 501 F.3d 644, 649 (6th Cir. 2007) ("'[I]n [a First Amendment] case, the issues of

the public interest and harm to the respective parties largely depend on the constitutionality of

the statute.'").  "Thus, to the extent that [Plaintiff] can establish a substantial likelihood of

success on the merits of its First Amendment claim, it also has established the possibility of

irreparable harm as a result of the deprivation of the claimed free speech rights." *Connection Distrib. Co.*, 154 F.3d at 288.

### III.    AN INJUNCTION WOULD NOT CAUSE SUBSTANTIAL HARM TO OTHERS.

As Plaintiff has demonstrated "a substantial likelihood that the challenged law is unconstitutional, no substantial harm to others can be said to inhere in its enjoinment." *Deja Vu of Nashville*, 274 F.3d at 400; *see also Connection Distrib. Co.*, 154 F.3d at 288.  Moreover, the harm to Plaintiff's constitutional rights in the absence of a preliminary injunction far outweighs any illusory harm to Defendants that could result from this Court insisting on adherence to the United States Constitution.  Any harms Defendants might imagine in the absence of the contribution ban are properly addressed by contribution limitations and disclosure requirements. *See Ezell v. City of Chicago*, 651 F.3d 684, 710 (7th Cir. 2011) ("[T]he harms invoked by the City are entirely speculative and in any event may be addressed by more closely tailored regulatory measures.").  On the other side of the scale, Plaintiff has established a genuine likelihood that the Constitution is violated every day Section 150 is in effect.  The injunction would not cause substantial harm to others.

### IV.    GRANTING AN INJUNCTION IS IN THE PUBLIC INTEREST, GIVEN THE IMPORTANT CONSTITUTIONAL RIGHTS AT STAKE.

The public interest is clearly served by requiring adherence to the Constitution.  *Miller*, 622 F.3d at 540 ("When a constitutional violation is likely, moreover, the public interest militates in favor of injunctive relief because it is always in the public interest to prevent violation of a party's constitutional rights.") (internal citations omitted).  Because Plaintiff has established that Section 150 violates the United States Constitution, a preliminary injunction is in the public interest.

## V.      THE WAIVER OF BOND IS APPROPRIATE.

This Court has discretion to waive the security requirements of Fed. R. Civ. P. 65(c), or require only a nominal bond.  *Stockslager v. Carroll Elec. Cooperative Corp.*, 528 F.2d 949, 951 (8th Cir. 1976) (amount of bond required upon the issuance of a preliminary injunction is within the sound discretion of the district court); *see also Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999) (recognizing that "[o]ur sister circuits have construed Fed. R. Civ. P. 65(c) as investing the district court with discretion as to the amount of security required, if any," and listing cases).  When a preliminary injunction would merely require compliance with the Constitution, no bond is required.  *See Doe v. Pittsylvania County, Va.*, 842 F. Supp. 2d 927, 937 (W.D. Va. 2012) (fixing the bond at zero dollars where injunction merely required compliance with the Constitution); *Baca v. Moreno Valley Unified School Dist.*, 936 F. Supp. 719, 738 (C.D. Cal. 1996) (waiving bond because "to require a bond would have a negative impact on plaintiff's constitutional rights, as well as the constitutional rights of other members of the public affected by the policy"); *Smith v. Board of Election Com'rs for City of Chicago*, 591 F. Supp. 70, 72 (N.D. Ill. 1984) (recognizing that, in cases involving constitutional rights, requiring plaintiffs to post bond would condition the exercise of those rights on plaintiffs' financial status).  Further, where the amount of potential damages is limited, a nominal bond of $1 is appropriate.  *Sak v. City of Aurelia, Iowa*, 832 F. Supp. 2d 1026, 1048 (N.D. Iowa 2011).  Here, Plaintiff is seeking only to vindicate its constitutional rights and, to this end, Plaintiff is represented pro bono.

Further, courts have found that a high likelihood of success on the merits supports waiver of the bond requirement.  *People of State of Cal ex rel. Van de Kamp v. Tahoe Regional Planning Agency*, 766 F.2d 1319, 1326 (9th Cir.), *amended on other grounds*, 775 F.2d 998 (9th Cir. 1985).  As demonstrated above, Plaintiff has shown a high likelihood of success on the

17

merits.  As such, it would be appropriate to waive the bond requirement or set bond at a nominal amount.

## CONCLUSION

The views of corporations are traditionally a counterbalance to those of unions.  This persistent characteristic of American labor relations is embodied in Plaintiff's dedication to fighting compulsory unionization and unions' efforts in opposition.  Equally persistent is the rule that government may not "restrict the speech of some elements of our society in order to enhance the relative voice of others." *Buckley*, 424 U.S. at 48–49.  A ban on the political speech of one element of society—while its natural counterpart freely contributes to candidates, parties, and committees—is unconstitutional from any perspective.  The equal protection, free speech, and free association protections of the United States Constitution proscribe Kentucky's discriminatory treatment of corporations.  Plaintiff respectfully asks this Court to declare Section 150 of the Kentucky Constitution, KRS 121.025, 121.035, and 121.150(20), and 32 Ky. Admin. Regs. 2:170 unconstitutional and enjoin Defendants from enforcing these laws to the extent they prohibit Plaintiff from contributing to political candidates, PACs, or party committees.

DATED this 10th day of August 2015.

Respectfully submitted,

/s/ James M. Manley
James M. Manley
(*admitted pro hac vice*)
Jared H. Blanchard
(*admitted pro hac vice*)
**Scharf-Norton Center for
Constitutional Litigation at the
GOLDWATER INSTITUTE**
500 E. Coronado Road
Phoenix, AZ 85004
(602) 462-5000
litigation@goldwaterinstitute.org

Jason M. Nemes
FULTZ MADDOX DICKENS PLC
101 South Fifth Street, 27th Floor
Louisville, Kentucky 40202-3116
(502) 992-5045
jnemes@fmdlegal.com

*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on August 10, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to attorneys and parties of record at this time and which will be available for review at a later date.


<u>/s/ James M. Manley</u>