# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF KENTUCKY
# CENTRAL DIVISION
# FRANKFORT DOCKET

| | |
|---|---|
| PROTECT MY CHECK, INC., | |
| Plaintiff, | **REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| CRAIG C. DILGER, Chairman, Kentucky Registry of Election Finance, in his official capacity; JOHN STEFFEN, Executive Director, Kentucky Registry of Election Finance, in his official capacity, | Civil Action No. 3:15-CV-42-GFVT |
| Defendants. | |

**TABLE OF CONTENTS**

SUMMARY .................................................................................................................................. 1
   I.    THE CONTRIBUTION BAN VIOLATES THE FOURTEENTH AMENDMENT. ......... 2
   II.   THE CONTRIBUTION BAN VIOLATES THE FIRST AMENDMENT. ..................... 7
   III.  PLAINTIFF'S REQUESTED RELIEF WILL NOT HARM THE PUBLIC. ................ 12
CONCLUSION .......................................................................................................................... 14

# TABLE OF AUTHORITIES

**Cases**

*Agostini v. Felton*, 521 U.S. 203 (1997) ............................................................................. 1, 2, 7

*Arizona Free Enter. Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2806 (2011) ..................... 5

*Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990) .................................... 1, 3, 5, 8

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494 (3d Cir. 1998) .......................... 6

*Buckley v. Valeo*, 424 U.S. 1 (1976) .................................................................................... 4, 7, 9

*Davis v. Federal Election Comm'n*, 554 U.S. 724 (2008) ............................................................ 4

*Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010) ......................................... passim

*City of Ladue v. Gilleo*, 512 U.S. 43 (1994) ........................................................................... 8, 11

*Connection Distrib. Co. v. Reno*, 154 F.3d 281 (6th Cir. 1998) ................................................ 13

*Dallman v. Ritter*, 225 P.3d 610 (Colo. 2010) ......................................................................... 3, 6

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ............................................................. 12

*Fed. Election Comm'n v. Beaumont*, 539 U.S. 146 (2003) ............................................ 2, 8, 9, 10

*Hamilton's Bogarts, Inc. v. Michigan*, 501 F.3d 644 (6th Cir. 2007) ........................................ 13

*Holmes v. FEC*, 71 F. Supp. 3d 178 (D.D.C. 2014) .................................................................. 13

*Kentucky Right to Life v. Terry,* 108 F.3d 637 (6th Cir. 1997) ................................................... 6

*McConnell v. Federal Election Comm'n*, 540 U.S. 93 (2003) ................................................ 9, 10

*McCutcheon v. Fed. Election Comm'n*, 134 S. Ct. 1434 (2014) .......................................... passim

*McNeilly v. Land*, 684 F.3d 611 (6th Cir. 2012) ....................................................................... 13

*Miller v. City of Cincinnati*, 622 F.3d 524 (6th Cir. 2010) ....................................................... 14

*Minnesota Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864 (8th Cir. 2012) ... 2, 3, 5, 9

*Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015) ................................................................ 4, 8, 11

*Republican Party of Minn. v. White*, 536 U.S. 765 (2002) .......................................................... 8

*Riddle v. Hickenlooper*, 742 F.3d 922 (10th Cir. 2014) .................................................................. 4

*Turner Broadcasting System, Inc. v. F.C.C.*, 512 U.S. 622 (1994) ................................................. 4

**Statutes**

KRS 121.025 ............................................................................................................................. 6, 14

KRS 121.035 ................................................................................................................................ 14

KRS 121.150 ................................................................................................................................ 14

KRS 121.170 ................................................................................................................................ 10

**Other Authorities**

R.J. Corman Railroad Group, LLC, http://www.rjcorman.com ...................................................... 5

*State Limits on Contributions to Candidates 2015-2016 Election Cycle*,
    National Conference of States Legislatures (May 2015),
    http://www.ncsl.org/research/elections-and-campaigns/state-limits-on-contributions-to-
    candidates.aspx ...................................................................................................................... 13

**Regulations**

11 C.F.R. § 110.1 ........................................................................................................................... 8

32 Ky. Admin. Regs. 2:170 .......................................................................................................... 14

**Constitutional Provisions**

Section 150 of the Kentucky Constitution ............................................................................. passim

## SUMMARY

There is no serious disagreement that the corporate contribution ban imposed by Section 150 of the Kentucky Constitution burdens the political speech of corporations like Plaintiff. Defendants dispute that the burden imposed by Section 150 is unconstitutional, but their defense of the ban flies in the face of everything the Supreme Court has said about the sanctity of political speech in the past five years. As discussed below, the contribution ban fails to serve the only government interest that could justify it: preventing quid pro quo corruption. Moreover, even if the ban served that interest, it goes too far in restricting fundamental freedoms, ignoring the equal protection clause of the Fourteenth Amendment, as well as the free speech and association clauses of the First Amendment.

Defendants rely almost exclusively on *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652, 654–55 (1990), *overruled by Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010), and the Eighth Circuit's decisions applying *Austin* to defend Section 150 against Plaintiff's equal protection challenge. Because the wealth aggregation and shareholder protection reasoning underlying *Austin*'s equal protection analysis has been rejected by the Supreme Court, Defendants tacitly concede that *Austin* is only binding to the extent it is directly applicable. Defendants' Memorandum in Opposition (Doc. 20) ("Opp'n") at 11 (citing *Agostini v. Felton*, 521 U.S. 203, 237 (1997)). *Austin* does not apply here for the simple reason that the Section 150 contribution ban is very different in its application and justification from the law at issue in *Austin*. Even if *Austin* did apply, the Eighth Circuit decisions on which Defendants rely helpfully demonstrate that strict scrutiny applies and *Austin*'s reasoning can no longer support a corporate speech ban. *See Minnesota Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864,

879–80 (8th Cir. 2012). Defendants have made no effort to meet even intermediate, much less strict scrutiny.

As with their response to the equal protection claim, Defendants rely on inapposite precedent and obsolete reasoning to defend Section 150's violation of the First Amendment. Although the parties agree that intermediate scrutiny applies to the First Amendment claim, Defendants attempt to avoid their burden under that standard. Rather, Defendants fall back on *Fed. Election Comm'n v. Beaumont*, 539 U.S. 146, 149 (2003), which is inapposite here. Unlike the federal law at issue in *Beaumont*, Section 150 draws arbitrary distinctions among unions, LLCs, and corporations and does not provide a corporate PAC option. *Beaumont* does not save Defendants from proving that Kentucky's corporate contribution ban is necessary to prevent corruption and Defendants present no evidence to justify the Section 150 ban.

Plaintiff is therefore likely to succeed on the merits and this Court should grant Plaintiff's Motion for Preliminary Injunction.

## I. THE CONTRIBUTION BAN VIOLATES THE FOURTEENTH AMENDMENT.

Despite their outsized reliance on *Austin*, Defendants do not dispute that *Austin* is an empty shell. The wealth aggregation and shareholder protection interests underpinning *Austin* have been repudiated by *Citizens United* and *McCutcheon*. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339 (2010); *McCutcheon v. Fed. Election Comm'n*, 134 S. Ct. 1434, 1448 (2014); *see* Plaintiff's Memorandum in Support (Doc. 19-1) ("Pl.'s Mem.") at 10–11. Defendants' only hope for relying on *Austin* is if it "has direct application in a case" and therefore "directly controls." *Agostini*, 521 U.S. at 237. But *Austin* does not "directly control[]." *Id*. Unlike the corporate contribution ban at issue here, *Austin* upheld a statute that imposed a partial ban on corporate *independent expenditures* and did not draw arbitrary distinctions

between corporations and LLCs. *Austin*, 494 U.S. at 654–55. This case challenges only Kentucky's unequal treatment of corporate, LLC, and union *contributions*. Far from "directly control[ing]," *Austin* has nothing in common with a case that deals only with arbitrary restrictions on political contributions. Accordingly, *Austin* does not control the outcome here; rather, Defendants must prove that Kentucky's corporate contribution ban is necessary to prevent corruption. *McCutcheon*, 134 S. Ct. at 1445–46.

Even if *Austin* were directly on point, the Eighth Circuit decision on which Defendants rely helpfully explains that Defendants still bear a "heavy burden":

> Under *Austin*, "statutory classifications impinging upon [the fundamental right to engage in political expression] must be narrowly tailored to serve a compelling governmental interest." *Id*. at 666, 110 S. Ct. 1391; *see also Dallman v. Ritter*, 225 P.3d 610, 634–35 (Colo. 2010) (holding a state law allowing corporations to contribute to candidates, but forbidding labor unions from doing the same, violated the Equal Protection Clause of the Fourteenth Amendment). We express no opinion as to the likelihood Minnesota will meet this heavy burden in light of the Supreme Court's rejection of the so-called anti-distortion rationale relied upon in *Austin*. *See Citizens United*, 558 U.S. at ——, ——, 130 S. Ct. at 903–08, 912–13.

*Minnesota Citizens*, 692 F.3d at 879–80 (substitutions in original). Having relied on *Minnesota Citizens*, Opp'n at 11, Defendants are well aware of the Eighth Circuit's conclusion that lopsided contribution bans must be "narrowly tailored to serve a compelling governmental interest." This means that the burden is on Defendants to prove that the Section 150 contribution ban is tailored to prevent corruption and avoids unnecessary abridgement of political speech. *McCutcheon*, 134 S. Ct. at 1445–46. Yet, Defendants fail to even attempt to meet their burden.

Before elaborating on Defendants' failure to meet their burden, a word about levels of scrutiny. As *Minnesota Citizens* makes clear, exacting scrutiny applies to contribution bans with equal protection implications. Contrary to Defendants' suggestion, there is nothing "anomalous" about applying strict scrutiny to a speech ban that draws distinctions between various speakers.

3

*See* Opp'n at 16. Indeed, the Court has recently reaffirmed that heightened scrutiny is required when the government uses speaker identity as a rough proxy for content:

> Because "[s]peech restrictions based on the identity of the speaker are all too often simply a means to control content," *Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 340, 130 S. Ct. 876, 175 L.Ed.2d 753 (2010), we have insisted that "laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference," *Turner*, 512 U.S., at 658, 114 S. Ct. 2445.

*Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2230 (2015). Likewise, discriminatory political contribution limits demand strict scrutiny because "there is something distinct, different, and more problematic afoot when the government *selectively* infringes on a fundamental right. *Cf. Davis v. Federal Election Comm'n*, 554 U.S. 724, 743–44 (2008) (suggesting that even in the First Amendment context "imposing different contribution . . . limits on candidates vying for the same seat" may call out for especially heightened scrutiny)." *Riddle v. Hickenlooper*, 742 F.3d 922, 932 (10th Cir. 2014) (Gorsuch, J., concurring). Regardless of how the test is described, if a law that restricts political contributions "does not 'avoid unnecessary abridgement' of First Amendment rights, it cannot survive 'rigorous' review." *McCutcheon*, 134 S. Ct. at 1445–46 (quoting *Buckley v. Valeo*, 424 U.S. 1, 25 (1976). Defendants cannot claim that banning corporate contributions is a "[]necessary abridgement" to prevent corruption while at the same time allowing contributions from other groups that could create the same problem. *Id*.

Defendants never contend that corporations are more corrupting than unions or LLCs. Indeed, aside from references to 19th Century railroad politics, Defendants do nothing to link the Section 150 ban to corruption of any kind. Opp'n at 1. Political speech regulations must "target what we have called '*quid pro quo*' corruption or its appearance. . . . Campaign finance restrictions that pursue other objectives, we have explained, impermissibly inject the Government 'into the debate over who should govern.'" *McCutcheon*, 134 S. Ct. at 1441

4

(quoting *Arizona Free Enter. Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2806, 2826 (2011)). Defendants' failure to address the only relevant government interest is fatal to their opposition.[1]

Unable to provide any evidence of corruption related to the contribution ban from the last 160 years, Defendants instead rely on the repudiated rationales of wealth aggregation and shareholder protection from *Austin*. Opp'n at 17–18. The basic flaw with Defendants' argument is that it is focused on "the corrosive and distorting effects of immense aggregations of wealth." *Austin*, 494 U.S. at 660. Wealth aggregation is no longer a valid justification for the State to stifle political speech, and so considerations about the corporate form and wealth aggregation are irrelevant to this case. *Citizens United*, 558 U.S. at 349, 362; *see also Minnesota Citizens*, 692 F.3d at 879–80; Pl.'s Mem. at 9–11. Only evidence that the ban on corporate contributions is uniquely necessary to address corruption is relevant here, *see id.*, and Defendants have presented none.

Moreover, wealth aggregation and shareholder protection are peculiar justifications for banning corporate contributions, but not LLC contributions. Defendants assert that Kentucky is justified in "applying different rules to groups and associations that are <u>not</u> protected by the same legal advantages as a corporations . . . ." Opp'n at 17–18 (emphasis in original). The problem is, corporations and LLCs <u>are</u> protected by very similar legal advantages. In any event, legal advantages that help corporations, LLCs, or unions aggregate wealth are irrelevant to the only government interest that matters here: preventing corruption.

---

[1] Incidentally, railroads discovered the LLC at some point after Reconstruction and can now engage in Kentucky politics, in spite of the Section 150 ban. *See, e.g.,* R.J. Corman Railroad Group, LLC, http://www.rjcorman.com. Nevertheless, Defendants offer no contemporary examples of "railroad promoters offer[ing] petty favors and bribes to Kentucky lawmakers in exchange for favorable treatment on legislation . . . ." Opp'n at 1.

Defendants do not draw any meaningful distinctions between corporations and LLCs. Defendants never even offer a rationale for treating LLCs and corporations differently, except to suggest that in the 21 years since Kentucky recognized LLCs, Defendants simply have not gotten around to regulating them. Opp'n at 19. Putting aside that LLCs could have been swept up in the contribution ban during the 2002 legislative changes that Defendants make so much of, Opp'n at 13, legislative laziness is not enough to justify fundamentally unfair treatment of different groups' First Amendment rights. *See Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 532 (3d Cir. 1998) *aff'd sub nom. Brokerage Concepts v. U.S. Healthcare, Inc.*, 251 F.3d 153 (3d Cir. 2000) ("We decline to read an affirmative policy statement into a legislature's failure to pass a law; to do so would be wholly speculative."). The Sixth Circuit's refusal to draw distinctions between for-profit and non-profit corporations in the context of KRS 121.025's ban on direct corporate contributions is instructive. In *Kentucky Right to Life v. Terry*, the plaintiffs argued that only Kentucky's statutory direct contribution ban was unconstitutional, only as applied to nonprofit corporations. 108 F.3d 637, 645–46 (6th Cir. 1997). The Sixth Circuit rejected that argument because there is no meaningful distinction between nonprofit and for-profit corporations in the context of the contribution ban, just as there is no meaningful distinction between corporations, LLCs, and unions in the context of the ban.

Nor do Defendants claim that there is any meaningful distinction between unions and corporations relevant to preventing corruption. Nor could they. The inherent nature of businesses and unions make them point and counterpoint. *See Dallman v. Ritter*, 225 P.3d 610, 634–35 (Colo. 2010) ("Although unions and corporations are structurally dissimilar, both are similarly situated under Amendment 54's [ban on candidate contributions]."). Businesses attempt to create wealth for their shareholders and unions attempt to capture some of that wealth

6

for their members.  That adversarial relationship is reflected in the issues the two sides fight over and the candidates the two sides support—or here, the candidates one side supports.

Defendants make much of the fact that "it is not as if any LLC may make a political contribution in Kentucky" and then go on to list the various limitations and requirements on LLC contributions.  Opp'n at 19.  Defendants perfectly capture what Plaintiff is requesting here:  not unfettered ability to make unlimited contributions or special dispensation to flood Kentucky elections with money, but simple equality and fairness in the rules that apply to all contributors.  Whatever valid campaign finance limits apply to unions and LLCs should apply to corporations, and vice versa.

## II. THE CONTRIBUTION BAN VIOLATES THE FIRST AMENDMENT.

Plaintiff agrees that *McCutcheon* provides the level of scrutiny for the First Amendment claim here and, contrary to Defendants' suggestion, Plaintiff has never argued otherwise.  *Compare* Pl.'s Mem. at 12, *with* Opp'n at 10.  Accordingly, if Section 150 "does not 'avoid unnecessary abridgement' of First Amendment rights, it cannot survive 'rigorous' review."  *McCutcheon*, 134 S. Ct. at 1445–46 (quoting *Buckley*, 424 U.S. at 25).

Rather than meet this standard, Defendants fall back on *Beaumont*.  Defendants underestimate the reach of *Citizens United*, which "blazes through our precedents, overruling or disavowing a body of case law including . . . *FEC v. Beaumont*, 539 U.S. 146, 123 S. Ct. 2200, 156 L.Ed.2d 179 (2003) . . . ."  *Citizens United*, 558 U.S. at 395 (Stevens, J, dissenting).  As with *Austin*, Defendants can be saved by *Beaumont* only if it "directly controls."  *Agostini*, 521 U.S. at 237.  It does not.

*Beaumont* is closer to this case than *Austin*, but the federal law upheld in *Beaumont* differed in two important respects that distinguish this case from that one:  (1) the federal law

restricting contributions applies evenhandedly to unions, LLCs, and corporations, suggesting that the Kentucky ban is animated by animus toward corporations; and (2) the federal law includes a robust PAC option, which Defendants concede Kentucky does not provide. Opp'n at 5–6.

The law upheld in *Beaumont* applied across the board to all organizations. *See* 11 C.F.R. § 110.1. *Beaumont* did not address the sort of lopsided ban that Defendants enforce in Kentucky. The lopsided nature of the Section 150 ban distinguishes this case from *Beaumont*, and also erodes Defendants' justification for the ban on First Amendment grounds. *See City of Ladue v. Gilleo*, 512 U.S. 43, 52 (1994) (Regulatory exemptions "may diminish the credibility of the government's rationale for restricting speech in the first place."). Underinclusive speech restrictions are unconstitutional because a "'law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction on truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited . . . .'" *Reed*, 135 S. Ct. at 2232 (quoting *Republican Party of Minn. v. White*, 536 U.S. 765, 780 (2002)). Other than relying on outright speculation and the repudiated rationales of shareholder protection and wealth aggregation, Defendants make no attempt to justify the underinclusiveness of Section 150, as discussed above. Nor do Defendants acknowledge how significantly underinclusive Section 150 is when compared to the law at issue in *Beaumont*.

This case also differs fundamentally from *Beaumont* because Defendants admit that Kentucky has no corporate PAC option and at the same time do not dispute that "[t]he Supreme Court has never upheld a regulation on *direct* corporate political contributions without noting that it was doing so because those regulations allowed corporations to make *indirect* contributions through establishing, financing, maintaining, and controlling a PAC." Pl.'s Mem. at 12-13 (citing *Beaumont*, 539 U.S. at 149; *Austin*, 494 U.S. at 660; and *Buckley*, 424 U.S. at 29

n.31). The Eighth Circuit upheld Minnesota's ban on direct contributions because "[l]ike Minnesota's law, the challenged provision in *Beaumont* prohibited corporations from making election-related contributions, but allowed corporations to establish, administer, and control a PAC, through which the corporation could solicit contributions." *Minnesota Citizens*, 692 F.3d at 879. Nothing in the Eighth Circuit's decision suggests that it was taking a different view of the PAC option than what the Supreme Court has described as the essential constitutional minimum. *See McConnell v. Federal Election Comm'n*, 540 U.S. 93, 203 (2003) ("The ability to form and administer separate segregated funds . . . has provided corporations and unions with a constitutionally sufficient opportunity to engage in express advocacy."). The lack of a PAC option further distinguishes this case from *Beaumont*, and is fatal to Section 150.

Defendants attempt to excuse the lack of a PAC option by reference to options for corporate *employees* to engage in political activity, which are irrelevant. If *Citizens United* decided anything, it is that corporations themselves have an independent right to speak, even if corporations themselves can establish PACs, which of course in Kentucky they cannot. 558 U.S. at 337 ("Section 441b is a ban on corporate speech notwithstanding the fact that a PAC created by a corporation can still speak. A PAC is a separate association from the corporation. So the PAC exemption . . . does not allow corporations to speak."). It is even feebler to contend that a complete ban on corporate contributions is excused by the fact that employees may contribute.[2]

---

[2] As Plaintiff noted previously, *see* Pl.'s Mem. at 14, it is far from certain that the Supreme Court would find the PAC option to be a sufficient alternative since a PAC "does not allow corporations to speak." *Citizens United*, 558 U.S. at 337. For now, whether the PAC option goes far enough is academic in light of Section 150's unequivocal ban. At the very least, the contribution ban must be enjoined because it lacks a "PAC option [that] allows corporate political participation." *Beaumont*, 539 U.S. at 163.

Additionally, Defendants point to KRS 121.170 for the proposition that a corporation can form a *federal* PAC in order to participate in Kentucky state and local elections. Opp'n at 14. Defendants offer no explanation why a corporation could contribute to state and local candidates through a federal PAC without risk of corruption, but not a Kentucky PAC.

Regardless, it seems that the PAC option created by KRS 121.170 is unlawful. The federal PAC option created by KRS 121.170 is in direct conflict with Section 150 of the Kentucky Constitution, which prohibits corporations from even "indirectly . . . influenc[ing] the result of any election in this State . . . ." Even more tellingly, KRS 121.170 is in direct conflict with Defendants' enforcement of Section 150, which prohibits the "establishment, administration, and solicitation of contributions" with corporate funds. *See* Advisory Opinion 2008-003 (Compl. Ex. 1); Advisory Opinion 2014-003 (Compl. Ex. 2); Ky. Op. Atty. Gen. 91-80 (Compl. Ex. 3).

Even if KRS 121.170 somehow allowed corporations to contribute to Kentucky candidates in contravention of the Kentucky Constitution and Defendants' own practices, at best Defendants are arguing that Kentucky maintains a separate but equal system of campaign finance: one for corporations and one for unincorporated groups. While unions, LLCs, and other unincorporated groups are free to form Kentucky PACs, corporations are—for no apparent reason—required to instead form a federal PAC. How this fights corruption or relates to any legitimate government interest is a mystery left unsolved by Defendants. KRS 121.170 is simply further proof that Kentucky arbitrarily discriminates against corporate speech for no other reason than irrational animus to the corporate form. At the very least, the contribution ban must be enjoined because it lacks a "PAC option [that] allows corporate political participation." *Beaumont*, 539 U.S. at 163; *McConnell*, 540 U.S. at 203.

Unwilling to recognize the shortcomings of *Beaumont*, Defendants make little effort to justify the Section 150 ban. Defendants fervently argue that anti-corruption and anti-circumvention remain viable interests after *Citizens United*. Opp'n at 12. Plaintiff never argued otherwise. Pl.'s Mem. at 14. But identifying the interests that supposedly motivate the ban is not enough. Defendants must demonstrate a connection between those interests and an outright ban on one form of political speech. *McCutcheon*, 134 S. Ct. at 1445–46. That burden includes justifying the lopsided application of the ban. *Reed*, 135 S. Ct. at 2232; *City of Ladue*, 512 U.S. at 52. That burden also includes justifying a ban on corporate contributions, rather than more modest regulations tailored to prevent corruption. *McCutcheon*, 134 S. Ct. at 1459–60 ("[D]isclosure often represents a less restrictive alternative to flat bans on certain types or quantities of speech."). And that burden also entails an explanation of how a ban on limited contributions makes any sense, when unlimited independent expenditures are allowed. Opp'n at 14–15. Independent expenditures are not a substitute for direct candidate contributions. *McCutcheon*, 134 S. Ct. at 1454 ("We have said in the context of independent expenditures that the absence of prearrangement and coordination of an expenditure with the candidate or his agent . . . undermines the value of the expenditure to the candidate."). It defies credulity that a corporation could spend unlimited funds on independent expenditures advocating the election or defeat of a candidate in Kentucky, but a single dollar in corporate contributions would destroy public confidence in democracy—especially in light of the dollars already flowing directly to candidates from unions and LLCs. After *Citizens United*, the Section 150 contribution ban is untenable in light of the changed landscape of campaign finance law.

Defendants address their burden under the First Amendment by asserting that the interests purportedly served by Section 150 are important, and pointing to the oldness of the ban

as evidence of its propriety. Opp'n at 12. The implications of Defendants' argument are breathtaking. Under Defendants' theory, so long as the government can assert an interest that might be connected to a speech ban, and that ban is older than some arbitrary number of years, the law passes constitutional muster. Defendants' theory of the First Amendment bears no resemblance to the high bar set by the Supreme Court for judging laws that restrict our most fundamental freedoms. *See McCutcheon*, 134 S. Ct. at 1445–46. Defendants' utter disregard for *McCutcheon*'s requirement that contribution limits be tailored to "avoid unnecessary abridgement of First Amendment rights" is fatal to their opposition. *Id*.

### III.   PLAINTIFF'S REQUESTED RELIEF WILL NOT HARM THE PUBLIC.

Plaintiff is suffering an ongoing violation of its First and Fourteenth Amendment rights. Defendants have not responded by meeting their heavy burden to prove that the Section 150 contribution ban is tailored to prevent corruption and avoids unnecessary abridgement of political speech. Instead, Defendants warn of impending "chaos" resulting from protection of Plaintiff's constitutional rights. *See* Opp'n at 20. However, Defendants, in choosing to indulge in speculation and ignore their burden, have failed to demonstrate how unspecified and speculative harms cannot be addressed through less restrictive means. *See Ezell v. City of Chicago*, 651 F.3d 684, 710 (7th Cir. 2011) ("[T]he harms invoked by the City are entirely speculative and in any event may be addressed by more closely tailored regulatory measures.").

Moreover, Defendants' speculation is entirely unfounded. Defendants argue that enjoining their illegal contribution ban and vindicating Plaintiff's constitutional rights will "cause chaos for current candidates and the general public," but the relief Plaintiff requests— allowing corporations to contribute up to the limit to which all other groups are allowed to

contribute—is the status quo in 20 states across the country.³ Six additional states allow unlimited contributions from businesses and unions, free of chaos.⁴

Plaintiff has established a likelihood of success on the merits and has thus established that it is suffering from irreparable harm. *See Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) ("[T]o the extent that [Plaintiff] can establish a substantial likelihood of success on the merits of its First Amendment claim, it also has established the possibility of irreparable harm as a result of the deprivation of the claimed free speech rights."). Because Plaintiff is suffering an ongoing violation of its constitutional rights, the balance of equities must favor granting injunctive relief. *Hamilton's Bogarts, Inc. v. Michigan*, 501 F.3d 644, 649 (6th Cir. 2007) ("'[I]n [a First Amendment] case, the issues of the public interest and harm to the respective parties largely depend on the constitutionality of the statute.'").

Defendants point to a handful of cases to argue the balance should tip against the Plaintiff. *See* Opp'n at 20. However, the denial of injunctive relief in those cases did not turn on the balance of the equities, but rather on the moving party's failure to establish a constitutional injury. *See McNeilly v. Land*, 684 F.3d 611, 621 (6th Cir. 2012) ("Given the failure to show a substantial likelihood of success on the merits . . . the district court's conclusion . . . [regarding] the public interest . . . is also proper."); *Holmes v. FEC*, 71 F. Supp. 3d 178 (D.D.C. 2014)

---

³Arkansas, California, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Kansas, Louisiana, Maine, Maryland, Nevada, New Jersey, New Mexico, New York, South Carolina, Tennessee, Vermont, allow equally limited contributions. *See State Limits on Contributions to Candidates 2015-2016 Election Cycle*, National Conference of States Legislatures (May 2015), http://www.ncsl.org/research/elections-and-campaigns/state-limits-on-contributions-to-candidates.aspx.

⁴ Alabama, Missouri, Nebraska, Oregon, Utah, and Virginia all allow unlimited contributions from businesses and unions. *Id.*

(finding no likelihood of success); *Rufer v. FEC*, 64 F. Supp. 3d 195 (D.D.C. 2014) (same). The public interest is always served by requiring adherence to the Constitution. *Miller v. City of Cincinnati*, 622 F.3d 524, 540 (6th Cir. 2010) ("When a constitutional violation is likely, moreover, the public interest militates in favor of injunctive relief because it is always in the public interest to prevent violation of a party's constitutional rights."). Accordingly, Plaintiff's request for injunctive relief should be granted.

## **CONCLUSION**

The equal protection, free speech, and free association protections of the United States Constitution proscribe Kentucky's discriminatory treatment of corporations. Plaintiff respectfully asks this Court to declare Section 150 of the Kentucky Constitution, KRS 121.025, 121.035, and 121.150(20), and 32 Ky. Admin. Regs. 2:170 unconstitutional and enjoin Defendants from enforcing these laws to the extent they prohibit Plaintiff from contributing to political candidates, PACs, or party committees.

DATED this 14th day of September 2015.

Respectfully submitted,

/s/ James M. Manley
James M. Manley
(*admitted pro hac vice*)
Jared H. Blanchard
(*admitted pro hac vice*)
**Scharf-Norton Center for Constitutional Litigation at the GOLDWATER INSTITUTE**
500 E. Coronado Road
Phoenix, AZ 85004
(602) 462-5000
litigation@goldwaterinstitute.org

Jason M. Nemes
FULTZ MADDOX DICKENS PLC
101 South Fifth Street, 27th Floor
Louisville, Kentucky 40202-3116
(502) 992-5045
jnemes@fmdlegal.com

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I certify that on the 14th day of September 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to attorneys and parties of record at this time and which will be available for review at a later date.

/s/ James M. Manley